# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| JAMES W. CLARK, LEROY E. DRURY, | ) | Case No. 08-CV-4158 |
| CALUMET HEAT TREATING | ) | |
| CORPORATION, NITREX, INC., and | ) | Judge Joan B. Gottschall |
| THOMAS G. COOPER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| CALUMET HEAT TREATING | ) | |
| CORPORATION, NITREX, INC., and | ) | |
| THOMAS G. COOPER, | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| LIBERTY MUTUAL INSURANCE | ) | |
| COMPANY, ROBERT SIERKS and | ) | |
| GENERAL CASUALTY COMPANY OF | ) | |
| ILLINOIS, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

On July 22, 2008, the United States filed suit against James Clark and Leroy Drury under sections 107(a) and 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601-9675 ("CERCLA"). (Doc. 1.) The government sought reimbursement for response costs incurred in connection with a facility known as the South Green Plating Superfund Site (the "Superfund Site") located in Chicago, Illinois. Clark was alleged to be an operator at the Superfund Site, doing business as Temper Tough, Inc. and JC Enterprises. Drury was the

former president and registered agent for Temper Tough. (*See id.*) In January, 2009, the government amended its complaint to add additional defendants Calumet Heat Treating Corporation ("Calumet"), Nitrex, Inc. ("Nitrex"), and Thomas G. Cooper (collectively, "CHTC"). (Doc. 19 ("Compl.").)

According to the complaint, Calumet owned the Superfund Site from 1946 to 1993 "and conducted heat treating operations, a thermal process for strengthening metals." (Compl. ¶ 13.) Cooper is the president of Calument, and Nitrex is alleged to be the legal successor of Calumet. (*Id.* ¶¶ 9-10.)

CHTC filed a third-party complaint against Liberty Mutual Insurance Company ("Liberty"), General Casualty Company of Illinois ("General Casualty") (collectively, the "Insurers"), and Robert Sierks, seeking a declaratory judgment that the Insurers have a duty to defend and indemnify CHTC in this action and seeking contribution from Sierks. (Doc. 57.) The Insurers filed third-party counterclaims seeking declaratory judgments that no duty to defend or indemnify exists. (Docs. 49, 69.) CHTC and the Insurers have filed cross-motions for partial summary judgment, seeking to establish whether the Insurers have a duty to defend CHTC in this action. (Docs. 88, 98, 100.)[1]

## I. BACKGROUND

The Superfund Site is composed of two separate properties, located at 12130 South Green Street (the "Green Street property") and 12139 Peoria Street (the "Peoria Street property"), on approximately one acre of land located in a primarily residential area. (Compl. ¶¶ 11-12.) According to the complaint, Calumet conducted its heat treating business at the Peoria Street property beginning in 1946 and at the Green Street

---

[1] Liberty also filed a motion for default judgment against CHTC for failing to answer Liberty's third-party counterclaim. (Doc. 95.) CHTC has since answered (Doc. 108), and Liberty's motion for default judgment is accordingly denied.

2

property beginning in 1954. (*Id.* ¶ 60.) Calumet owned both properties and continued to operate its business on them until 1993. In February 1993, Cooper moved Calumet's business to another location and allowed Clark to conduct his own heat treating business at the Superfund Site. Clark had abandoned the Superfund Site by the end of 2003. (*Id.* ¶¶ 13-16.)

The City of Chicago (the "City") acquired ownership of the Green Street property in April 2002 in a tax delinquency sale. (*Id.* ¶ 17.) The City eventually requested assistance from the United States Environmental Protection Agency ("EPA") in removing hazardous materials from the property. (*Id.* ¶ 22.) EPA assisted with removal from the Green Street property, and, after the City acquired the Peoria Street property in a separate tax sale in February 2005, EPA expanded its removal efforts to the entire Superfund Site. (*Id.* ¶¶ 23, 30.) Removal activities were completed by July, 2005. (*Id.* ¶ 33.)

EPA arrived at the Green Street Property in October 2004 to begin removal. The government's complaint describes the condition of the property as follows:

> 23. On October 6, 2004, the Superfund Technical Assessment and Response Team ("START") conducted site reconnaissance. START observed evidence of leaking drums and containers, and two large underground pits containing materials of unknown contents.
>
> 24. Analytical results for samples collected at the Site by START during the initial site reconnaissance indicated the presence of heavy metals including, barium, cadmium, chromium, and lead, as well as cyanides and corrosive and caustic liquids, which are hazardous substances within the meaning of CERCLA Section 101(14), 42 U.S.C. § 9601(14).
>
> 25. Based on the findings described above, EPA determined, pursuant to Section 104(a) of CERCLA, 42 U.S.C. § 9604(a), that releases or threats of release into the environment of hazardous substances at or from the Site presented an imminent and substantial endangerment to the public health or welfare.

26. Accordingly, EPA issued an action memorandum for a time-critical removal action at the Site on April 11, 2005.

27. EPA mobilized at the Site to commence removal activities on May 16, 2005.

28. EPA's investigation revealed that the Green Street property contained drums and containers of chlorinated solvents, corrosive acidic liquids, flammable liquids, and paint waste. Dust from the floor of the building contained cyanide, barium, chromium, cadmium, and lead. In addition, bricks from around the furnaces contained chromium, and polychlorinated biphenyls ("PCBs") were discovered in a large pit under the process line.

29. Moreover, the building itself was in poor condition and had cracked floors and broken windows, providing an augmented path of exposure to the outside environment.

(*Id.* ¶¶ 23-29.) In summarizing the removal efforts at the Superfund Site, the complaint states that EPA "incurred costs to mitigate releases or threats of releases of hazardous substances at the facility pursuant to Sections 104 and 107 of CERCLA, 42 U.S.C. §§ 9604 and 9607." (*Id.* ¶ 35.)

During a portion of the time that Calumet conducted operations at the Superfund Site, both Liberty and General Casualty provided Calumet with comprehensive general liability insurance ("CGL"). Liberty issued a series of policies to Calumet between 1972 and 1983 (*see* CHTC's Exs. D, E), and General Casualty issued policies between 1984 and 1987 (*see* CHTC's Ex. H). These standard CGL policies contain largely identical provisions and require the Insurers to defend and indemnify Calumet in suits for damages "because of . . . property damage." (CHTC's Ex. D at CHTC00001; Ex. H at CHTC00159.)

The Insurers have both refused to defend CHTC in this action. CHTC filed a motion for partial summary judgment against the Insurers. (Doc. 88.) Liberty filed a motion for partial summary judgment against CHTC. (Doc. 98.) And General Casualty

4

filed a motion for partial summary judgment against CHTC, Sierks, the United States, and Liberty. (Doc. 100.) Each motion asks the court to resolve the third-party claims and counterclaims with respect to the dispute over whether the Insurers have a duty to defend CHTC.

## II. STANDARD OF REVIEW

Summary judgment is warranted where "the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see also Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). If a plaintiff has failed to establish a genuine issue of material fact regarding one of the elements of his case, then summary judgment will be entered in favor of the defendants. *See Beard v. Banks*, 548 U.S. 521, 529-30 (2006); *see also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999). These same principles apply on cross-motions for summary judgment. *Metropolitan Life Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002).

## III. ANALYSIS

### A. Allegations in the Government's Complaint

The parties agree Illinois courts have frequently been asked to consider whether suits for costs incurred in responding to environmental contamination caused by an insured triggers an insurer's duty to defend under a CGL policy. *See*, *e.g.*, *Outboard*

*Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204 (Ill. 1992).[2] The relevant law in these cases has been well established, and, despite the numerous briefs filed on the three cross-motions for summary judgment, the parties do not actually disagree about the legal principles involved or the interpretation of standard CGL provisions. The heart of the dispute in this case is how the underlying complaint ought to be construed in determining whether the Insurers have a duty to defend against the government's allegations.

There is no dispute that CGL policies establish the Insurers' duty to defend certain suits. The Liberty policies provide for defense and indemnity of suits alleging property damage:

> "The company [Liberty] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . . ."

(CHTC's Ex. D at CHTC00001.)[3] The General Casualty policies contain virtually identical language. (CHTC's Ex. H at CHTC00159.)

The duty to defend is broader than the duty to indemnify. *Outboard Marine*, 607 N.E.2d at 1220. The court will compare the language of the insurance policy with the allegations of the underlying complaint to determine whether the complaint triggers the duty to defend. *Id.* Construction of an insurance contract is a legal question, so a dispute over the duty to defend is appropriately decided on a motion for summary judgment. *T.H.E. Ins. Co. v. City of Alton*, 227 F.3d 802, 805 (7th Cir. 2000).

---

[2] The parties agree that Illinois law governs this insurance dispute.

[3] There is also no dispute that the United States has filed a "suit against the insured seeking damages" as defined in the CGL policies. *See Outboard Marine*, 607 N.E.2d at 1216 (holding that "suit seeking damages" includes CERCLA claims seeking payment of response costs).

The court must construe both the policy and the allegations of the complaint liberally in favor of the insured. *Outboard Marine*, 607 N.E.2d at 1220; *U.S. Fid. & Guar. Co. v. Specialty Coatings Co.*, 535 N.E.2d 1071, 1075 (Ill. App. Ct. 1989). "If the court determines that these allegations fall within, or *potentially within*, the policy's coverage, the insurer has a duty to defend the insured against the underlying complaint." *Outboard Marine*, 607 N.E.2d at 1220 (emphasis in original). The allegations in the complaint must be read liberally in favor of the insured, and, unless the allegations foreclose the possibility of coverage, a court must conclude that the Insurer has a duty to defend. *Outboard Marine*, 607 N.E.2d at 1221 (allegation that defendant discharged contaminants, in absence of allegation that discharge was intended or expected, may be read as accidental discharge); *Ill. Emcasco Ins. Co. v. Nw. Nat. Cas. Co.*, 785 N.E.2d 905, 908 (Ill. App. Ct. 2003).

The Insurers raise three main arguments against the applicability of the "property damage" provisions. First, they argue that the complaint alleges no "property damage." That term is defined in the CGL contracts as "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period." (CHTC's Ex. D at CHTC00003; Ex. H at CHTC00168.) The parties agree that Illinois courts have held that environmental contamination is considered "physical injury to . . . tangible property." *See Specialty Coatings*, 535 N.E.2d at 1081. The Insurers maintain, however, that the complaint contains no allegation that any

7

hazardous substance was released, nor that any property was actually contaminated. (*See* Liberty Reply at 3.)

The Insurers' reading of the complaint does not comport with the liberal standard required in determining the duty to defend. The complaint states that the EPA found "leaking drums and containers, and two large underground pits containing materials of unknown contents." (Compl. ¶ 23.) Analysis of the unknown contents revealed that they were "hazardous substances within the meaning of CERCLA Section 101(14)." (*Id.* ¶ 24.) "Based on the findings described above, EPA determined, . . . that releases or threats of release into the environment of hazardous substances at or from the Site presented an imminent substantial endangerment to the public health and welfare." (*Id.* ¶ 25.) Further, the dilapidated state of the building on the Green Street property "provid[ed] an augmented path of exposure to the outside environment." (*Id.* ¶ 29.) The duty to defend arises where the allegations fall potentially within the CGL coverage; these allegations certainly indicate the potential of environmental contamination through "releases" of "harzardous substances."[4]

Liberty cites several cases involving environmental response costs where Illinois courts found a duty to defend. In each of these cases, Liberty points out, there were clear allegations of environmental contamination. (*See* Doc. 104 at 8-11.) But to trigger a duty to defend, clear allegations are not required. *See Outboard Marine*, 607 N.E.2d at 1220; *Specialty Coatings Co.*, 535 N.E.2d at 1075. The cases cited by Liberty do not hold otherwise.

---

[4] CHTC contends that, in construing the allegations of the complaint, the court can read in definitions of terms such as "environment," "hazardous substance," and "release" that are defined in CERCLA. Because the court concludes that the allegations, on their face, trigger the duty to defend, the court need not address this issue.

8

Second, the Insurers argue that the complaint does not allege that the response costs are damages "caused by an occurrence." The CGL policies define "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (CHTC's Ex. D at CHTC00003; Ex. H at CHTC00168.) The parties agree that an accidental release of hazardous materials over the period of time covered by the policies would constitute an occurrence. *See Specialty Coatings*, 535 N.E.2d at 1077. The Insurers contend, however, that the complaint alleges only that the costs are a result of CHTC's and Clark's abandonment of hazardous materials at the Superfund Site. Because CHTC intentionally left the materials, according to the Insurers, any environmental contamination that resulted could not be considered accidental. *See AAA Disposal Sys., Inc. v. Aetna Cas. & Sur. Co.*, 821 N.E.2d 1278, 1290-91 (Ill. App. Ct. 2005) (response costs incurred in capping landfill are not caused by an "occurrence" because they are known costs of doing business).

Again, the allegations must be read liberally in favor of CHTC. The Insurers read the allegations as stating that the substances were released after the property was abandoned by Calumet. That is one potential reading of the complaint, but nowhere in the complaint does the government allege that releases occurred on a specific date. Another potential reading of the allegations is that releases occurred during the coverage period, and that EPA did not discover the contamination until 2004. Recognizing the plausibility of this second reading, the court must conclude that the complaint alleges an "occurrence."

Third, the policies exclude coverage of "property damage to property owned or occupied by or rented to the insured . . . ." (CHTC's Ex. D at CHTC00001; Ex. H at CHTC00159-60.) The Insurers contend that the complaint alleges only costs associated with cleaning the Superfund Site, so the damages in this suit must be excluded from coverage. They note that there is an exception to this rule when pollution contaminates groundwater, *see LaSalle Nat'l Trust, N.A. v. Schaffner*, 818 F. Supp. 1161, 1169 (N.D. Ill. 1993), but there is no mention of groundwater in the government's complaint.

However, the complaint states that EPA discovered "releases or threats of release into the environment of hazardous substances at *or from* the Site" (Compl. ¶ 25 (emphasis added)), and that there may have been "exposure to the *outside* environment" (*id.* ¶ 29 (emphasis added)). These allegations demonstrate the potential of damage to property outside of the Superfund Site.

The government's allegations do not state unambiguously that environmental contamination during the policy period caused injury. The underlying complaint is far from clear about what transpired at the Superfund Site. But the allegations do not foreclose the possibility that the evidence will show that the subject of the suit does fall within the CGL coverage. Thus the court concludes that Liberty and General Casualty have a duty to defend against the government's allegations.

**B.      Additional Issues Raised by the Parties**

The parties expend considerable effort in the briefing discussing a number of other issues that are not ultimately relevant to resolution of the summary judgment motions. Some of the CGL policies provide coverage for suits for "damages because of personal injury." (*See*, *e.g.*, CHTC's Ex. H at CHTC00159.) The parties dispute whether

10

this provision applies in this case. Because the court determines that the Insurers' duty to defend is triggered by the "property damage" provisions, it need not reach this question.

Both Liberty and General Casualty discuss the "pollution exclusion" in the CGL policies. In the Liberty policies, that provision states: "This policy does not apply . . . to . . . property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental." (CHTC's Ex. D at CHTC00001.) The 1984 General Casualty policy has a very similar provision. (CHTC's Ex. H at CHTC00159-60.)

The Insurers find fault with CHTC's discussion of this exclusion, but, ultimately, they do not argue the exclusion prevents coverage in this case. Indeed, Illinois law is clear that the exception to the exclusion for contamination that is "sudden and accidental" permits coverage for unintended and unexpected environmental contamination. *See Outboard Marine*, 607 N.E.2d at 1220. As discussed above, in the absence of any allegation that the environmental contamination here was intentional, the complaint can be read as describing unintended and unexpected contamination. *Id.* at 1221. General Casualty also argues that its 1985 and 1986 policies contain an absolute pollution exclusion, and it asks for summary judgment that these policies do not trigger a duty to defend. But the court declines to reach this question, because the pollution exclusion in the 1984 policy clearly contains the narrower exclusion. If it is later determined that contamination occurred in 1985 or 1986, then the absolute pollution exclusion may be

11

important in determining General Casualty's duty to indemnify. However, the complaint does not foreclose the possibility that contamination occurred while the 1984 policy was effective. Thus, General Casualty has a duty to defend under that policy.

Liberty and CHTC argue back and forth in briefing about whether or not an agent of Liberty previously told CHTC that Liberty would assume the defense in this action. However, CHTC only addresses this issue in the introduction to its briefs. (*See* Doc. 89 at 2-3.; Doc. 112 at 3.) CHTC never provides any legal argument suggesting how the disputed statement by Liberty would be relevant to these motions. Accordingly, the court declines to address this issue.

**C.     Duty to Defend Nitrex**

CHTC argues that because the government has alleged that Nitrex is the corporate successor of Calumet, the Insurers have a duty to defend Nitrex for its liability arising out of Calumet's actions.[5] The government's complaint states that Cooper and Sierks established a corporation called Alliance Metal Treating, Inc. ("AMTI") in 1993, and, shortly thereafter, Calumet's assets were sold to AMTI. (Compl. ¶¶ 69, 71.) According to the government, AMTI was thus "a mere continuation of [Calumet]." (*Id.* ¶ 68.) In June 2000, Nitrex USA Holding, Inc. ("Nitrex USA") allegedly acquired the stock of AMTI and changed AMTI's name to Nitrex, Inc. (*Id.* ¶ 80.) Under Illinois law, a corporation purchasing the assets of another does not ordinarily take on the liabilities and obligations of the seller, but there is an exception where the buyer is a mere continuation of the seller. *Vernon v. Schuster*, 688 N.E.2d 1172, 1175-76 (Ill. 1997).

---

[5]     The Insurers raise no objection to Calumet's position that because Cooper is an officer, director, and shareholder of Calumet, he is an insured under the CGL policies.

As discussed above, to determine whether an insurer has a duty to defend, the court generally compares the provisions of the insurance contract to the allegations in the underlying complaint. *Outboard Marine*, 607 N.E.2d at 1220. A court may look beyond the complaint in determining whether a party is an "insured" under the contract. *Transcontinental Ins. Co. v. National Union Fire Ins. Co. of Pittsburgh*, 662 N.E.2d 500, 508 (Ill. App. Ct. 1996); *Bituminous Cas. Corp. v. Fulkerson*, 571 N.E.2d 256, 261 (Ill. App. Ct. 1991). However, in this case, there is no argument that Nitrex is an insured under the contract. Rather, Nitrex contends that it succeeded to Calumet's rights under the contract through the operation of separate contracts and Illinois law. *Knoll Pharm. Co. v. Auto. Ins. Co.*, 167 F. Supp. 2d 1004 (N.D. Ill. 2001), the sole case cited by CHTC, presents facts analogous to those at issue here. In *Knoll*, Boots USA, the insured, was sold by its parent to a third party; Boots USA then merged with Knoll. *Id.* at 1005-06. Knoll sought summary judgment that the insurer of Boots USA owed Knoll a duty to defend. *Id.* at 1005. The court looked to the CGL policy, the contracts consummating the merger, and Illinois law in determining whether the insurance rights transferred to the successor corporation. *Id.* at 1007-11. The court did not consider the underlying complaint in its analysis.

In this case, to determine the Insurers' duty to defend Nitrex, the court would look to the CGL contracts, the contract transferring the assets between Calumet and AMTI, and the contract transferring AMTI's stock to Nitrex USA. The latter two contracts are not before the court. Although the Insurers point out that the CGL policy does not name Nitrex as an insured, the parties' briefing does not adequately address these issues. None of the parties recognize that the court must look to the various contracts in deciding this

question. At this stage of the litigation, without the evidence before it, the court cannot determine whether Illinois law permits Nitrex to succeed to Calumet's rights under the policies. Accordingly, summary judgment is denied to all parties with respect to this issue.[6]

### IV. CONCLUSION

Liberty's and General Casualty's motions for summary judgment are denied. CHTC's motion for summary judgment is granted in part and denied in part. The court holds that the Insurers have a duty to defend Calumet and Cooper. CHTC's motion is denied with respect to the Insurers' duty to defend Nitrex.

ENTER:  /s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: August 19, 2010

---

[6] In answering the government's complaint, Calumet and Nitrex deny that Nitrex is the "legal successor" to Calumet. (Doc. 25 ¶¶ 9, 88.) The Insurers argue that this admission dooms Nitrex's efforts to establish a duty to defend. However, reading the allegations in context, it is clear that the government is alleging that Nitrex is the legal successor of Calumet *for the purposes of CERCLA liability*. (*See* Doc. 19 ¶ 88.) Nitrex's denial of this allegation should not be taken as an admission that Nitex did not succeed to Calumet's rights under the insurance contracts.